IN THE SUPREME COURT OF NORTH CAROLINA

No. 140A19

Filed 28 February 2020

IN THE MATTER OF: D.W.P., B.A.L.P.

Appeal pursuant to N.C.G.S. § 7A-27(a)(5) from an order entered on 23 January 2019 by Judge Angela C. Foster in District Court, Guilford County. Heard in the Supreme Court on 6 November 2019.

*Mercedes Chut, for petitioner-appellee Guilford County Department of Health and Human Services*

*Coats & Bennett, PLLC, by Gavin Parsons, for appellee Guardian ad Litem*

*Michael Spivey for respondent-appellant mother*

BEASLEY, Chief Justice.

Respondent, the mother of D.W.P. (David)[1] and B.A.L.P. (Briana), appeals from the trial court's 23 January 2019 order terminating her parental rights. The issue before the Court is whether the trial court made and relied upon findings of fact that were supported by clear, cogent, and convincing evidence in assessing respondent-mother's reasonable progress to remedy the conditions that led to the removal of her children. After careful consideration of the relevant legal authorities and in light of the record evidence, we affirm the trial court's decision.

---

[1] A pseudonym is used to protect the juveniles' identities and for ease of reading.

## I.    Facts and Procedural History

On 1 March 2015, the Guilford County Department of Health and Human Services (GCDHHS) received a Child Protective Services (CPS) report that eleven-month old David was being treated at MedCenter Emergency Department in High Point for a broken femur. The doctor examining David had also performed a body scan and the results showed older clavicle, tibia, fibula, and rib fractures that were still in the process of healing. During the GCDHHS investigation, respondent-mother stated that she never noticed any signs that David had been harmed and attributed his fractured femur to the family's seventy-pound dog and suggested that the children's biological father had inflicted the older injures.

On 20 March 2015, based on David's young age and the multiple fractures for which respondent-mother and her fiancé, Mr. Goff, provided no plausible explanation, GCDHHS filed a petition and nonsecure custody motion relating to of David and Briana. On the same date, Judge Betty J. Brown entered an order granting nonsecure custody of both children to GCDHHS. After a hearing held on 26 January 2016, the court adjudicated David an abused and neglected juvenile and adjudicated Briana, although she had no injuries, a neglected juvenile. Legal and physical custody of both children was granted to GCDHHS and a permanency planning hearing was set for 23 March 2016. Respondent-mother appealed the trial court's order.

The COA affirmed David's adjudication as abused and neglected, but reversed Briana's adjudication as being a neglected juvenile. See *In re D.P. and B.P.*, 250 N.C.

App. 507, 793 S.E.2d 287 (2016) (unpublished). The court remanded the case to the trial court to make appropriate findings of fact and conclusions of law to determine if Briana was, in fact, a neglected juvenile. *Id.* Respondent-mother later stipulated at the adjudication hearing on 27 October 2017 that Briana was neglected.

As a result of David's injuries, respondent-mother was charged with felony child abuse inflicting serious injury. On 9 November 2017, she entered an *Alford* plea to misdemeanor child abuse and was placed on probation for twelve months. During the allocution, respondent-mother told the court David's injuries may have occurred because he "slept funny." The trial court made a finding from this testimony that respondent-mother provided yet another explanation for the injuries that was inconsistent with previously submitted evidence involving David's injuries. Following respondent-mother's plea, there was a permanency hearing on 30 November 2017.

Following the hearing, the court entered an order ceasing reunification efforts and directing GCDHHS to file a petition for termination of parental rights. GCDHHS did so on 20 March 2018. After an 8 January 2019 termination hearing, the trial court entered its order terminating respondent-mother's parental rights on 23 January 2019. The court acknowledged that respondent-mother had completed many of the requirements set out in the permanency plan, but concluded that she had willfully failed to make reasonable progress to remedy the conditions that led to removal of her children, that her neglect continued, and that she was likely to neglect the children in the future.

Among other things, the court specifically focused on respondent-mother's refusal to honestly report how David's injuries occurred. Because respondent-mother and Mr. Goff were David's only caretakers at the time of the incident, the court identified only three possible causes of the injuries: (1) respondent-mother caused the injures, (2) respondent and Mr. Goff caused the injuries together, or (3) respondent-mother failed to protect David from Mr. Goff causing the injuries. Without knowing the cause of the injuries, the court believed GCDHHS was unable to provide a plan to ensure that injuries would not occur in the future.

Respondent-mother appealed the trial court's order terminating her parental rights, arguing that the trial court made and relied upon findings of fact that were unsupported by clear, cogent, and convincing evidence in assessing her reasonable progress to remedy the conditions that led to the removal of her children.

## II. Discussion

Termination of parental rights proceedings consist of two stages: adjudication and disposition. N.C.G.S. §§ 7B-1109, -1110 (2017); *In re Montgomery*, 311 N.C. 101, 110, 316 S.E.2d 246, 252 (1984). At the adjudicatory stage, the petitioner must prove by "clear, cogent, and convincing evidence" that one or more grounds for termination exist under section 7B-1111(a) of our General Statutes. N.C.G.S. § 7B-1109(e), (f) (2017). Thus, we review a district court's adjudication "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re Montgomery*, 311 N.C. at 111, 316 S.E.2d at 253

(citing *In re Moore*, 306 N.C. 394, 404, 293 S.E.2d 127, 133 (1982)). Unchallenged findings of fact made at the adjudicatory stage, however, are binding on appeal. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991) (citing *Schloss v. Jamison*, 258 N.C. 271, 275, 128 S.E.2d 590, 593 (1962)). If the petitioner proves at least one ground for termination during the adjudicatory stage, "the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights." *In re D.L.W.*, 368 N.C. 835, 842, 788 S.E.2d 162, 167 (2016) (citing *In re Young*, 346 N.C. 244, 247, 485 S.E.2d 612, 614–15 (1997); N.C.G.S. § 7B-1110)).

On appeal, respondent-mother challenges several of the trial court's findings of fact as unsupported by clear, cogent, and convincing evidence as well as its conclusions of law regarding her progress in remedying the conditions that led to the removal of her children and the likelihood of future neglect.

*A. Challenged Findings of Fact*

Findings of fact supported by competent evidence are binding on appeal, despite evidence in the record that may support a contrary finding. *See In re Montgomery,* 311 N.C. at 112-13, 316 S.E.2d at 254. Further, it is the duty of the trial judge to "'pass[ ] upon the credibility of the witnesses and the weight to be given their testimony and the reasonable inferences to be drawn therefrom.'" *In re D.L.W.*, 368 N.C. 835, 843, 788 S.E.2d 162, 168 (2016) (quoting *Knutton v. Cofield*, 273 N.C. 355, 359, 160 S.E.2d 29, 33 (1968)). The trial judge's decisions as to the weight and

credibility of the evidence, and the inferences drawn from the evidence are not subject to appellate review. *Id.*

"In all actions tried upon the facts without a jury . . . the court shall find the facts specifically and state separately its conclusions of law thereon . . . ." N.C.G.S. § 1A-1, Rule 52(a)(1). Thus, the trial court must, through "processes of logical reasoning," based on the evidentiary facts before it, "find the ultimate facts essential to support the conclusions of law." *See In re Harton*, 156 N.C. App. 655, 660, 577 S.E.2d 334, 337 (2003). The resulting findings of fact must be "sufficiently specific" to allow an appellate court to "review the decision and test the correctness of the judgment." *Quick v. Quick*, 305 N.C. 446, 451, 290 S.E.2d 653, 657 (1982).

1. *Respondent-mother has not been honest about, or has concealed the truth about, the cause of David's injuries.*

The trial court made several findings of fact about respondent-mother's failure to reveal the source of David's injuries, including:

> Despite her participation and completion of some of the recommended services, [respondent-mother] has not honestly reported how [David] received his injuries. Because she and Mr. Goff were the sole caretakers of the juvenile at the time, there are only three possible scenarios: (1) [respondent-mother] caused the injuries, (2) [respondent-mother] and Mr. Goff caused the injuries together, and (3) [respondent-mother] failed to protect [David] from Mr. Goff causing the injuries. Without knowing which of these scenarios occurred, the Department was unable to put the necessary services in place in order to return the juveniles to a safe and appropriate home.

. . .

> Given that [respondent-mother] has refused to admit how [David] received his injuries while in the exclusive care of herself and Mr. Goff, and has refused to accept responsibility for her actions, there is a likelihood of the repetition of neglect by [respondent-mother].

. . .

> [Respondent-mother] has not put the best interest of the juveniles ahead of her decision to conceal the truth from the Department and from the Court as to the actual cause of [David's] injuries. She has provided several explanations and none are medically consistent with the injuries. Since [David] has been in the custody of the Department, he has not sustained any more injuries of the sort he presented with on March 1, 2015.

Respondent-mother argues that the trial court's findings were not supported by evidence because the court could not and did not find that she or Mr. Goff had harmed David. We disagree.

Dr. Briggs, the Pediatric Child Abuse Specialist who examined David, reported that David suffered older fractures to the femur, anterior ribs and one posterior rib, lower legs and the clavicle. While she could not provide an exact date for when each injury occurred, she reported that the fractures were in different stages of healing, there was no medical reason for all the fractures, and she did not believe any of the injuries were four or five months old. Respondent-mother reported to the GCDHHS that she and Mr. Goff were David's only caretakers at the time of the most recent injury.

Respondent-mother initially reported that the most recent injury could have been caused by the seventy-pound family dog, and she believed the older injuries occurred while David was with his biological father in November 2014. On 3 March 2015, however, Dr. Briggs observed that while it was not impossible for the dog to have caused one break in David's leg, the incident does not explain the other, older fractures. And while respondent-mother was concerned that David's biological father may have harmed him, Dr. Briggs concluded that many of the fractures were newer than the last reported contact David had with his father.

Respondent-mother fails to offer a medically feasible explanation for the injuries or to take responsibility for the role she and Mr. Goff had in causing them, despite ample evidence that the injuries could not have been caused by any other person. Accordingly, we conclude that the trial court's findings regarding respondent-mother's truthfulness about the source of David's injuries is supported by clear, cogent, and convincing evidence.

> *2. Respondent-mother violated her probation by failing to obtain a psychiatric evaluation as a condition of probation as required by Dr. Holm.*

The trial court found that respondent-mother "ha[d] not completed a psychiatric evaluation. The completion of a psychiatric evaluation was also a condition of her probation[,] yet she has failed to participate in one." Respondent-mother argues that she was not required to have a psychiatric evaluation as a

condition of probation and that she was ordered to report only for an initial evaluation by "any state licensed mental health agency specifically for child abuse." We disagree.

A special condition of respondent-mother's probation was to "[r]eport for initial evaluation by any state licensed mental health agency specifically for child abuse, participate in all further evaluation, counseling, treatment, or education programs recommended as a result of that evaluation, and comply with all other therapeutic requirements of those programs until discharged." Thus, respondent-mother was not only required to obtain an initial evaluation, but she was also required to participate in any recommended treatment as a result of the evaluation. Dr. Holms' report recommended that "an assessment by a psychiatrist would be helpful in furthering [respondent-mother's] desire to maintain a stable and loving home for her children with a minimum of disruption and conflict in [respondent-mother's] interactions with other adults."

Respondent-mother made no effort to follow Dr. Holms' recommendation, although doing so was a requirement of her probation. Thus, clear, cogent, and convincing evidence exists to support the trial court's finding as to respondent-mother's probation violation.

3. *Respondent-mother resumed a relationship with Mr. Goff and they were working on reestablishing their relationship.*

The trial court found that

> [Respondent-mother] resumed a relationship with [Mr. Goff] in June 2017 shortly after the death of her father, but

> failed to inform the Department as agreed. At that time, she provided [Mr. Goff] with a new key to her home. [Mr. Goff] was providing emotional support to [respondent-mother], and they were working on reestablishing their relationship . . .

Respondent-mother initially ended her relationship with Mr. Goff in September 2016. The record shows, and respondent-mother does not dispute, that she and Mr. Goff reconnected in June 2017. Respondent-mother informed the court that she relied on Mr. Goff for emotional support after the passing of her father. She explained that she was very isolated at the time and could not talk to many people, except Mr. Goff. Several months after the two resumed contact, respondent-mother testified that she provided Mr. Goff with access to her home to fix an electrical problem while she was at work. After the repair, she did not ask him to return the key to her home, even after a domestic violence incident ensued between the two.

Because respondent-mother admits that she did in fact resume contact with Mr. Goff and provided him with a key to her home, the trial court's finding that respondent-mother resumed a relationship with Mr. Goff and they were working on reestablishing a relationship is supported by clear, cogent, and convincing evidence.

4. *Respondent-mother continued a relationship with Mr. Goff despite domestic violence incidents.*

Although there were no direct findings that respondent-mother had been abused by Mr. Goff before they separated, her testimony at the termination hearing indicates that one of the reasons they separated was because there was a possibility

he could have caused the injuries to David. Despite these concerns, respondent-mother reconnected with Mr. Goff in September 2016. On 26 April 2018, after resuming her relationship with Mr. Goff, respondent-mother called the police because Mr. Goff had followed her to work, barricaded her in her car, and took her phone. Respondent-mother did not ask Mr. Goff to return the key to her home, nor did she change the locks after this incident.

Finally, after an encounter on 19 May 2018, when Mr. Goff entered her house, attempted to suffocate her with a pillow, and strangled her, respondent-mother sought a protective order. From these facts, there is clear, cogent, and convincing evidence that respondent-mother maintained a relationship with Mr. Goff despite domestic violence incidents.

> 5. *Respondent-mother offered a new explanation for David's injuries during her* Alford *plea.*

In Briana's adjudication order, the court found by clear, cogent, and convincing evidence that respondent-mother offered a new explanation for David's injuries during his plea allocation: that David may have slept on his side. Respondent-mother did not challenge this finding at the adjudicatory stage; therefore, it is binding on appeal. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991).

> 6. *Respondent-mother intentionally withheld information concerning her marriage and lied to and evaded a social worker who came to her house.*

The court found that

> [Respondent-mother] has maintained that she was not in a

-11-

relationship with anyone since Mr. Goff. The evidence, however, is to the contrary. [Respondent-mother] began a relationship with Mr. Holyfield in June 2018; she married him on September 1, 2018. [Respondent-mother] was aware that she needed to notify the Department of her marriage. At the time of the juveniles' removal from her care, she was engaged to Mr. Goff. Mr. Goff provided the Department with his name, date of birth, and necessary information for the Department to conduct a complete background check. Mr. Holyfield has not been subjected to the same scrutiny and is therefore, not an approved person to have contact with the juveniles or to have the juveniles returned to his home.

Respondent-mother testified that she had known Mr. Holyfield since they were children. They reconnected and began dating in June 2018, Mr. Holyfield moved into respondent-mother's home between July and August 2018, and the two married in September 2018. She further testified that she believed it was relevant to the case that she had married Mr. Holyfield. However, she did not inform her social worker, or any party involved in the case about her relationship with him, either before or after their marriage. Even after being asked questions about her housing arrangement at a family team meeting in December 2018, respondent-mother failed to disclose information about Mr. Holyfield living with her. Until the date of the termination hearing, respondent-mother's case supervisor testified that she had never heard of Mr. Holyfield.

Additionally, respondent-mother had never missed a home visit prior to her husband moving in with her. However, on 20 November 2018, after Mr. Holyfield moved in, she missed her first home visit. The case supervisor testified that she

knocked on the door and called out to respondent-mother, but no one answered the door. She observed respondent-mother's car in the driveway along with an unidentified car. She further testified that as she was leaving, she saw respondent-mother peer out the window, and immediately received a voicemail from respondent-mother saying that she was too sick to open the door.

The facts above support, by clear, cogent, and convincing evidence, the trial court's finding that respondent-mother hid her marriage and evaded social workers.

7. *Respondent-mother failed to gain insight about David's injuries and make reasonable progress.*

The trial court made the following findings of fact regarding respondent-mother's failure to determine the cause of David's injuries:

> Despite her participation in therapeutic services, [respondent-mother] has not gained sufficient insight or made sufficient progress in order to disclose how [David] received his injuries. Throughout the time the juveniles have been in foster care, [respondent-mother] has offered several explanations for the injuries. In October 2017, [respondent-mother] appeared close to disclosing the cause of [David's] injuries. The Department has had multiple conversations with [respondent-mother] regarding [David's] injuries and how she believed they occurred. [Respondent-mother] shared with Social Worker Haik that she did not cause physical harm to the juvenile, she however, recognizes that as their mother, she was ultimately responsible for their care and supervision and accepts that role, very clearly now; and if the juveniles were returned to her, she would have to take a more cautious approach to allowing other people to care for the juveniles. According to [respondent-mother], she did not know how the injuries were inflicted/caused; so she was looking for an explanation for the injuries. The Department and

[respondent-mother] have discussed various options, including, medical reasons, and most recently, on the night that [David's] leg was injured, [David] was in the care of Mr. Goff, the mother's [fiancé] at the time of the injuries, who was bathing him while she was preparing dinner. [Respondent-mother] indicated that during that time, she was primarily working outside the home, and again, she did not know how the injuries occurred, but as their mother, she was responsible, and [David] was in the care of Mr. Goff at the time. [Respondent-mother] has continually indicated that [David's biological father] caused the femur fracture, the ribs and the tibia injuries to [David]; this is contrary to the medical evidence. [Respondent-mother] had no other explanation at the time. However, on November 9, 2017, [respondent-mother] tendered a guilty plea pursuant to *Alford* with regard to [David's] injuries, in Case #15CRS74373. [Respondent-mother] was originally charged with Felony Neglect Child Abuse-Serious Physical Injury, but the charge was reduced to Misdemeanor Child Abuse. [Respondent-mother], during the allocution, offered yet another explanation for the cause of [David's] injuries, to wit that he may have slept funny. This explanation is contrary to the evidence previously submitted at the Adjudicatory Hearing involving [David], and clearly demonstrates [respondent-mother's] failure to make progress.

…

[Respondent-mother] has not made adequate progress within a reasonable period of time under the plan. Although she has addressed some of the components in her service agreement, she has not addressed concerns which led to the filing of the petition, namely how [David] received his injuries which were caused by non-accidental trauma. [Respondent-mother] has completed the Domestic Violence Intervention Program (DVIP) and the Parent Assessment Training and Education Program (PATE), she has made most, if not all her scheduled visits and she was engaging in individual therapy until April 2018. Despite the completion of those services, significant questions remain as to the cause of [David's] injuries, which included: multiple bilateral healing rib fractures - left 5, 6, 7, 8, 9, 10

and right 3, 4, 5, 6, 7 and possibly 8; mid-shaft left clavicle fracture; acute, comminuted left femoral diaphyseal fracture; possible healing fracture of the proximal left humeral metaphysis; healing right tibial fracture; possible healing fracture of the distal right fibula; possible comer fracture of the posterior aspect of the distal left tibial metaphysis; possible healing fracture of the distal right femoral metaphysis.

…

[Respondent-mother] has not put the best interest of the juveniles ahead of her decision to conceal the truth from the Department and from the Court as to the actual cause of [David's] injuries. She has provided several explanations and none are medically consistent with the injuries. Since [David] has been in the custody of the Department, he has not sustained any more injuries of the sort he presented with on March 1, 2015. [Respondent-mother] is the only person who has been criminally charged in this matter: Felony Child Abuse with Serious Injury. And, although she tendered a guilty plea to a Misdemeanor charge pursuant to Alford, she has never admitted that she or anyone else inflicted those injuries on [David]. The juveniles have been in foster care since March 2015, and the Court is still no closer to knowing exactly how [David] sustained his injuries. Because of that, [respondent-mother] has not adequately remedied the conditions that brought the juveniles into custody.

Respondent-mother has maintained that she does not know the cause of David's injuries and has offered explanations that are not medically supported. She acknowledged that she would not rule out the possibility that Mr. Goff committed the injuries to David, but she also admits to resuming contact with him after the children were taken from the home. While we recognize that respondent-mother has taken the proper steps to attend parenting classes and therapy, and has followed the majority

of the court's recommendations to become a better parent, she has failed to acknowledge the harm that has resulted from her failure to identify what happened to David. Without recognizing the cause of David's injuries, respondent-mother cannot prevent them from reoccurring. Therefore, the trial court's finding that respondent-mother failed to gain insight and make reasonable progress regarding David's injuries is supported by clear, cogent and convincing evidence.

*B. Challenged Conclusions of Law*

In termination of parental rights proceedings, this Court reviews trial court orders "by determining whether the trial court's findings of fact are supported by clear, cogent, and convincing evidence and whether those findings support the trial court's conclusions of law." *In re B.O.A.*, 372 N.C. 372, 379, 831 S.E.2d 305, 310 (2019) (citing *In re Moore*, 306 N.C. 394, 404, 293 S.E.2d 127, 133 (1982)). The trial court found that grounds exist to terminate respondent-mother's parental rights under N.C.G.S. § 7B-1111(a)(1), which provides that:

> (a) The court may terminate the parental rights upon a finding of one or more of the following:
>
> (1) The parent has abused or neglected the juvenile. The juvenile shall be deemed to be abused or neglected if the court finds the juvenile to be an abused juvenile within the meaning of G.S. 7B-101 or a neglected juvenile within the meaning of G.S. 7B-101.

N.C.G.S. § 7B-1111(a)(1).

Respondent-mother disputes the trial court's conclusion that she will likely neglect her children in the future. GCDHHS argues that the trial court did not err in its conclusion that the children were neglected. A neglected juvenile is defined, in relevant part, as "[a] juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; . . . or who lives in an environment injurious to the juvenile's welfare" N.C.G.S. § 7B-101(15).

Where, as here, the child has not been in the custody of the parent for a significant period of time, the trial court must employ a different kind of analysis to determine whether the evidence supports a finding of neglect. This is because requiring the petitioner in such circumstances to show that the child is currently neglected by the parent would make termination of parental rights impossible. *In re Ballard*, 311 N.C. 708, 714, 319 S.E.2d 227, 231 (1984) (overturning the termination of the respondent-mother's parental rights where the court failed to make an independent determination of whether neglect existed at the time of termination hearing). "The determinative factors must be the best interest of the child and the fitness of the parent to care for the child *at the time of the termination proceeding*." *Id.* at 715, 319 S.E.2d 227, 565.

Thus, when a child has been separated from their parent for a long period of time, the petitioner must prove (1) prior neglect of the child by the parent and (2) a likelihood of future neglect of the child by the parent. *In re M.A.W.*, 370 N.C. 149, 152, 804 S.E.2d 513, 516 (2017) (quoting *In re D.L.W.*, 368 N.C. 835, 843, 788 S.E.2d

162, 167 (2016)). The trial court found that respondent-mother failed to protect David. David's primary caregivers were respondent-mother and Mr. Goff; and the court's findings indicate that either of them, or both of them, caused David's injuries. *See In re Y.Y.E.T.*, 205 N.C. App. 120 (2010) (affirming termination of parental rights on ground of abuse and neglect based on finding that both parents were responsible for child's non-accidental injuries and each parent refused to identify the perpetrator). Even still, our Court has recognized that a termination of parental rights for neglect cannot be based solely on past conditions that no longer exist. *In re M.A.W.*, 370 N.C. at 152, 804 S.E.2d at 516.

In this case, the trial court's order relies upon: past abuse and neglect; failure to provide a credible explanation for David's injuries; respondent-mother's discontinuance of therapy; respondent-mother's failure to complete a psychiatric evaluation; respondent-mother's violation of the conditions of her probation; the home environment of domestic violence; respondent-mother's concealment of her marriage from GCDHHS; and respondent-mother's refusal to provide an explanation for or accept responsibility for David's injuries.

While we recognize the progress respondent-mother has made in completing her parenting plan, including completing parenting classes, attending therapy, and regularly visiting with her children, we are troubled by her continued failure to acknowledge the likely cause of David's injuries. The State of North Carolina has long recognized that the best interests of the child are always treated as the paramount

consideration in termination of parental rights cases. Termination of parental rights proceedings are not meant to be punitive against the parent, but to ensure the safety and wellbeing of the child. *See In re Montgomery,* 311 N.C. 101, 109, 316 S.E.2d 246, 252 (1984) (recognizing that the determinative factor in deciding whether a child is neglected is the circumstances and conditions surrounding the child, and not the culpability of the parent).

Here, the findings of fact show that respondent-mother has been unable to recognize and break patterns of abuse that put her children at risk. Despite respondent-mother's acknowledgement that Mr. Goff could have caused David's injuries, she re-established a relationship with him that resulted in domestic violence. Subsequently, respondent-mother, after acknowledging the importance of notifying the GCDHHS that her new husband resided in her home, concealed the relationship from her case supervisors. Respondent-mother acknowledges her responsibility to keep David safe, but she refuses to make a realistic attempt to understand how he was injured or to acknowledge how her relationships affect her children's wellbeing. These facts support the trial court's conclusion that the neglect is likely to reoccur if the children are returned to respondent-mother's care.

Because there is sufficient evidence to support one ground for termination of respondent-mother's parental rights, the Court need not address the second ground for termination—that respondent-mother willfully left her children in foster care for

more than twelve months without making reasonable progress. *See, B.O.A.,* 372 N.C. at 380, 831 S.E.2d at 311; N.C.G.S. §7B-1111(a)(2).

The neglect ground for termination is supported by the court's findings that respondent-mother has failed to acknowledge her responsibility for the events leading to her children's removal from the home and due to her inability to pinpoint the cause of David's injuries. As a result, we are fully satisfied that the trial court's findings support its conclusion that respondent-mother has not made reasonable progress in correcting the conditions that led to the children's removal, and the children are likely to suffer neglect in the future. Accordingly, we affirm the trial court's order terminating respondent-mother's parental rights.

AFFIRMED.

Justice DAVIS took no part in the consideration or decision of this case.

Justice EARLS dissenting.

In this case, the trial court's findings of fact concerning whether the mother has been honest about how her son, David, was injured are based on a fallacious logical deduction that ignores the possibility that she was either unwilling to lie in order to keep her children, or that she was unaware that her refusal to lie would result in her losing them. There is no doubt that David was seriously injured on repeated occasions by some person while he was in the custody of his mother and Mr. Goff. The evidence in the record further supports the factual finding that David's mother has, at different times, offered various possible explanations for David's injuries that are not consistent with opinions by David's treating physician about how the injuries might have been caused. The logical fallacy in the trial court's findings is the supposed fact that "[the mother] has not honestly reported how David received his injuries" because, in the trial court's view, only three scenarios are possible: (1) that his mother caused the injuries, (2) that his mother and Mr. Goff together caused the injuries, or (3) that his mother failed to protect David from Mr. Goff The trial court concludes, and this Court endorses, the logic that therefore David's mother must be lying because she will not say which of these three possibilities is correct. However, those are not the only three possible scenarios and they do not prove she is lying. David's mother has accepted responsibility for failing to protect her son. She has also maintained that she was not aware of the nature and extent of his injuries

until he was examined in the emergency room and that she does not know how they occurred. It is entirely possible that Mr. Goff injured David outside of her presence and that she honestly did not know the severity and recurring nature of his injuries until the hospital visit. To terminate her parental rights as to both of her children because she will not say that she knows how her son was injured if, in fact, she does not know that, is unjust.

Absent direct evidence that the mother ever injured David herself, or was ever present in the room when he was injured, and in light of her substantial compliance with virtually every requirement asked of her by DHHS, and further, in light of the fact that there is no evidence of any kind that the mother did anything other than protect her daughter, the termination of her parental rights as to both children was not justified by the evidence in this case.

The termination of parental rights followed determinations by the trial court that the mother had "addressed all of the conditions in her case plan" and that she had "completed the checklist that constituted her case plan." When a parent is in substantial compliance with a mandated case plan and consistently (1) maintains innocence as to causing harm to a child, (2) maintains that she lacks knowledge as to the cause of the child's injuries, and (3) acknowledges her responsibility as the primary caregiver to protect her children from harm, the parent's inability to identify the cause of the injuries should not alone suffice to support a determination that the

parent has not made "adequate progress" or that the parent is likely to neglect her children in the future, absent evidence that the parent is lying.

As noted by the majority, based on David's injuries and the lack of a plausible explanation, the Guilford County Department of Health and Human Services (DHHS) obtained nonsecure custody of David and his four-year-old sister, Brianna, on 20 March 2015. DHHS also filed a juvenile petition alleging that David was an abused and neglected juvenile and a juvenile petition alleging that Brianna was a neglected juvenile. A pre-adjudication, adjudication, and dispositional hearing was originally scheduled to take place on 20 May 2015, but was continued until 6 November 2015. At the 6 November 2015 hearing, the matter was again continued until 26 January 2016. The hearing finally took place on 26 January 2016, over ten months after the juveniles entered DHHS custody. Following the hearing, the trial court filed an order on 19 February 2016, that adjudicated David to be an abused and neglected juvenile and Brianna a neglected juvenile.

The mother appealed. On 15 November 2016, the Court of Appeals affirmed the trial court's order adjudicating David as an abused and neglected juvenile, but reversed and remanded the adjudication of neglect as to Brianna. *In re D.P. & B.P.*, 250 N.C. App. 507, 793 S.E.2d 287 (2016) (unpublished). While the adjudication orders were on appeal, the trial court conducted two permanency planning hearings pursuant to N.C.G.S. § 7B-906.1. Throughout the trial court proceedings, the mother's failure to explain David's injuries was the primary reason for not returning

the children to her care. After the first hearing on 23 March 2016, the trial court entered an order, filed 21 April 2016, finding that the mother "has been compliant with her case plan," but determining that the children could not return to her home because "the mother continues to deny how the juvenile, [David], received his injuries. She has indicated that she will not admit to something she did not do, nor will she 'throw [Mr. Goff] under a bus.' " The court also noted the mother's pending criminal charges relating to David's injuries as an additional barrier to reunification. The trial court set the primary permanent plan as adoption with a concurrent secondary plan of reunification, and the mother was ordered to continue complying with her case plan.

A second hearing took place on 2 September 2016. Following the hearing, the trial court entered an order filed 21 October 2016, providing similar reasons for why the children could not be returned to their mother. The trial court also referenced the mother's limited engagement (at that time) in therapy, as well as her social media posts,[1] but focused on her failure to explain David's injuries as the principal reason for not returning the children.[2] Around the end of September 2016, the mother ended her relationship with Mr. Goff.

---

[1] As part of her case plan, the mother was required to refrain from posting pictures of her children on any social media website. This record indicates this issue was subsequently resolved.

[2] For example, the trial court stated all of the following in various orders: "Although the mother has completed [programs], DHHS does not consider any progress being made as it has been a year and a half and there are still no answers as to how [David] was injured."; "The mother and father are participating in case plans, although the mother has yet to inform

On 9 November 2017, the mother entered an *Alford* plea to misdemeanor child abuse for the injuries suffered by David. The mother received a suspended sentence and was placed on supervised probation for a period of twelve months. As part of her probation, the trial court ordered her to comply with "all conditions set in DSS court."

The trial court conducted hearings on remand from the Court of Appeals on 27 October 2017 and 30 November 2017. In a combined adjudication, disposition, and permanency planning order filed 18 December 2017, the trial court again adjudicated Brianna to be a neglected juvenile after the mother stipulated to several findings of fact and consented to the adjudication. The trial court's order notes that the mother had "addressed all of the conditions in her case plan." However, the court did not believe the mother had made adequate progress under the plan because she could not explain how David was injured. As barriers to achieving permanence for the juveniles, the court listed the mother's criminal conviction—resulting from her *Alford* plea—for David's injuries, and her resulting probation which would prevent her from having unsupervised contact with David for twelve months. The trial court changed the permanent plan for David and Brianna to a primary plan of adoption with a secondary concurrent plan of guardianship. DHHS was ordered to cease reunification

---

[DHHS] who harmed the juvenile, [David] . . . ."; "The parents are not acting in a manner consistent [with] the health and safety of the juveniles. The mother has failed to acknowledge the severity of the injuries to her son and the need for DHHS to know who harmed him."; "The [c]ourt is concerned that we still do not know what happened to [David] . . . ."; "It is not possible for the juveniles to return to [the] home of a parent within the next six months. The mother continues to deny how the juvenile, David, received his injuries. She has indicated that she will not admit to something she did not do, nor will she 'throw [W.G.] under a bus.'

efforts with the mother and to file termination petitions within sixty days, in accordance with N.C.G.S. § 7B-906.1(m).

In its termination order filed 23 January 2019, the trial court found that the mother had completed parenting classes and a domestic violence intervention program, that she participated in therapy from March 2016 until April 2018, that she lived in stable housing, and that she had stable employment. However, the court determined both that the children were neglected and there was a likelihood of repetition of neglect, pursuant to N.C.G.S. § 7B-1111(a)(1), and that the mother willfully left her children in foster care or a placement outside the home for more than twelve months without showing reasonable progress under the circumstances in correcting the conditions which led to her children's removal, pursuant to N.C.G.S. § 7B-1111(a)(2). In making both determinations, the trial court seems to have relied almost exclusively on the fact that the mother had been unable to provide a sufficient explanation for David's injuries.

*1. The Mother's Honesty About David's Injuries*

The trial court's findings that his mother concealed the truth about David's injuries are not supported by competent evidence. The trial court concluded that "[d]espite the completion of those services, significant questions remain as to the cause of [David's] injuries." The court stated that the mother had "not adequately remedied the conditions that brought the juveniles into custody" because the court did not know "exactly how [David] sustained his injuries."

However, there is no record evidence indicating that the mother knew how David was injured. The trial court placed her in the impossible position of having to provide information she claims not to have. However, while the mother says she does not know how David's injuries occurred, she accepted that she was "ultimately responsible" for his injuries as his caretaker.[3] At the termination hearing, when asked whether Mr. Goff caused David's injuries, she acknowledged the possibility that Mr. Goff could have caused the injuries, stating "I do not know. I can't rule it out. But, that's—I don't know."

Further, and most importantly, there is no record evidence to suggest that the mother is lying about her ignorance of the cause of David's injuries. This fact distinguishes the instant case from that considered by the Court of Appeals in *In re Y.Y.E.T.*, 205 N.C. App. 120, 695 S.E.2d 517 (2010), cited by the majority. There, the Court of Appeals considered facts similar to the facts in this case. Two parents brought their child to Carolinas Medical Center, where the child was diagnosed with a fractured femur. *Id.* at 121, 695 S.E.2d at 518. Subsequent examination revealed additional injuries, and the Mecklenburg County Department of Social Services took

---

[3] The trial court provides conflicting factual findings on the issue of whether the mother accepted responsibility for David's injuries. The trial court states that the mother failed to take full responsibility for David's injuries. However, these statements are based on the mother's inability to provide an explanation for David's injuries. The trial court also states that the mother expressed to DHHS that "she was ultimately responsible for [the juveniles'] care and supervision and accepts that role," and that, while she did not know how David's injuries occurred, "she was responsible" as his mother. Therefore, to the extent that the trial court purports to find that the mother has not accepted responsibility for David's injuries, that finding is not supported by clear, cogent, and convincing evidence.

custody of the child. *Id.* The parents provided explanations for the injuries that were inconsistent with the opinions of medical professionals. *Id.* at 121–23, 695 S.E.2d at 518–19.

However, in *In re Y.Y.E.T.*, the parents claimed from the outset that they had witnessed the injury. First, the mother claimed that the child's leg was stuck between the bars of the crib and she removed the child from a crib, causing the injury. *Id.* at 121, 695 S.E.2d at 518. Later, the mother stated that the father removed the child from the crib. *Id.* When questioned, the father "provided different accounts of how he removed the juvenile from the crib," and it "sounded to the evaluator like the respondent-father was fitting the description of his motion to the twisting way that doctors indicated as the likely cause of the break to the femur." *Id.* at 124, 695 S.E.2d at 520. By contrast, the mother in this case has stated consistently that she was not present when she believes David's femur was broken, and does not know how the other injuries occurred. While the difference may be subtle, it is important. Subsection 7B-1109(f) of our General Statutes requires that the petitioner in a termination hearing prove all relevant facts "based on clear, cogent, and convincing evidence." N.C.G.S. § 7B-1109(f) (2017). Where, as here, the termination of parental rights rests so heavily on a parent's inability to explain a child's injuries, the rights cannot be terminated absent "clear, cogent, and convincing evidence" that the parent is actually concealing the cause of the injuries. While that evidence of concealment existed in *In re Y.Y.E.T.*, it does not exist here. It is of particular importance that, as

the trial court notes, there is a possible explanation for David's injuries other than abuse by his mother: namely that they were caused by Mr. Goff.

### 2. *Probation Violation for Failing to Obtain a Psychiatric Evaluation*

The trial court found that the mother failed to complete a psychiatric evaluation, which the court stated was a requirement of her case plan and a condition of her probation. While the record shows that the mother did not complete a psychiatric evaluation, there is no evidence in the record that a psychiatric evaluation was a clear requirement of her case plan.

As part of her case plan, the mother was required to cooperate with a parenting assessment. She completed the parenting assessment with Dr. Thomas A. Holm on 15 June 2015. Following the assessment, Dr. Holm issued a report dated 3 September 2015 that stated the following in response to questions posed by DHHS: "I believe that an assessment by a psychiatrist would be helpful in furthering [the mother's] desire to maintain a stable and loving home for her children . . . . In addition to a consultation with a psychiatrist, I recommend that [the mother] be referred for individual therapy." The section of the report labeled "Recommendations" contains no reference to a psychiatrist or a psychiatric evaluation.

Nevertheless, the trial court's 18 December 2017 adjudication, disposition, and permanency planning hearing order states that Dr. Holm recommended a psychiatric evaluation be completed. In the same order, the trial court found that the mother "has addressed all of the conditions in her case plan." The trial court also found that

"[DHHS] is willing to move forward with unsupervised visitation based on the mother's compliance with her case plan, compliance with [DHHS], addressing the risk that led to the removal of the juveniles, and her accepting responsibility as the mother." The trial court further found that the mother had "completed the checklist that constituted her case plan" and stated that questions remain, "[d]espite the completion of her case plan." It appears, then, that the recommendation that a psychiatric evaluation be completed was not part of the mother's case plan. Moreover, the transcript evidence shows that this alleged requirement was never communicated to the mother and the section of Dr. Holm's report referencing a psychiatric evaluation seems to be directed to DHHS, not the mother. To the extent that the trial court found the mother was required by her case plan to complete a psychiatric evaluation, that finding is not supported by clear, cogent, and convincing evidence.

The trial court also found that the mother violated her probation because she did not complete a psychiatric evaluation. The judgment for the mother's misdemeanor child abuse conviction specifically required that she "cooperate and follow all conditions set in DSS court" and a box was checked on the form requiring that she "[r]eport for initial evaluation by any state licensed mental health agency specifically for child abuse[,] participate in all further evaluation, counseling, treatment, or education programs recommended as a result of that evaluation." While the language quoted by the majority appears in the thirteen-page single-spaced report from Dr. Holm, it does not appear as one of his five detailed

"Recommendations" at the conclusion of the "Parenting Capacity Assessment/Psychological Evaluation." The evidence in the record shows that by the time of the termination hearing, the mother had, over the course of three years, completed twelve sessions of the Crossroads program for victims of domestic violence, completed the ten required sessions of the PATE program, and participated in the Care Coordination for Children Program. She was treated at Restoration Place Counseling between 25 August 2016 and 20 April 2018, and attended a total of 42 counseling sessions there. Put another way, over the course of 23 months she attended 42 counseling sessions. Given the mother's testimony that she was unaware that she was also supposed to complete an evaluation with a psychiatrist, the notion that the mother willfully violated her probation by failing to complete a psychiatric evaluation is not supported by clear, cogent, and convincing evidence.

3. *Relationship with Mr. Goff*

In its termination order, the trial court found that the mother had "resumed a relationship with [Mr. Goff] in June 2017" and that the two were "working on reestablishing their relationship." The trial court further found that the mother "put herself in the situation of domestic violence incidents with [Mr. Goff]." Respondent argues that none of these findings are supported by clear and convincing evidence, arguing that (1) no evidence supports a finding that the two were involved romantically, and (2) she "did not create a situation that posed a foreseeable or unreasonable risk that she would be the victim of criminal assaults" by Mr. Goff

Petitioner argues that the evidence supports a finding that the the mother and Mr. Goff resumed some type of relationship, whether or not it was romantic, and that the mother created the situation leading to her victimization by giving a key to Mr. Goff and not changing her locks.

As to the trial court's finding that the mother "put herself in the situation of domestic violence incidents," the mother is not responsible for the criminal actions of Mr. Goff. She gave Mr. Goff a key to her home so that he could perform electrical work. Months later, the trial court found that Mr. Goff approached the mother at her workplace, "pinned her to her car and took her phone." Less than a month later, Mr. Goff entered the mother's home while she was sleeping and violently assaulted her. As a result of that assault, the mother obtained an Ex Parte Domestic Violence Protective Order and later obtained a one-year Domestic Violence Order of Protection against Mr. Goff. While it may have been advisable for the mother to exercise better control over access to her home, the evidence does not support a finding that she caused the acts of violence perpetrated against her. Accordingly, the trial court's finding that the mother "put herself in the situation of domestic violence incidents" is not supported by clear, cogent, and convincing evidence.

The trial court's finding that the mother and Mr. Goff had resumed their relationship is also unsupported by the record. Prior to September 2016, the mother and Mr. Goff were involved in a romantic relationship. They were engaged to be married. Their relationship was certainly romantic in nature in the past. While the

evidence supports the trial court's finding that Mr. Goff subsequently provided some emotional support to the mother at the time of her father's death, the evidence does not extend beyond that point. Accordingly, the trial court's finding that the mother and Mr. Goff had "resumed a relationship" and "were working on reestablishing their relationship," with the implication that the relationship was romantic, is without clear, cogent, and convincing evidence in the record.

### 4. *New Explanation for David's Injuries during Alford Plea*

On 9 November 2017, David's mother entered an *Alford* plea to the charges related to David's injuries, pleading guilty to misdemeanor child abuse without admitting that she actually committed the offense. The trial court found that, at the plea hearing, the mother "offered yet another explanation for the cause of [David's] injuries, to wit that he may have slept funny." A review of the trial transcript shows clearly that she was not offering a new explanation for the cause of David's injuries, but was instead explaining, in response to a question, what initially went through her mind when she first saw her son with a swollen leg. The trial court's finding to the contrary, that the mother was offering "yet another explanation" contrary to the medical evidence, was not supported by clear, cogent, and convincing evidence. The majority takes the position that because this fact was also a finding made at the adjudicatory stage and not appealed at that time, it is binding now. However, the adjudication order that was entered after the mother's *Alford* plea on 9 November 2017 was an adjudication only as to her daughter, Brianna. The original adjudication

order as to David was entered 19 February 2016, well before the *Alford* plea. Moreover, this fact, even if it were true and binding with regard to both children, has no real bearing on any legitimate reason to terminate the mother's parental rights.

### 5. *Withholding Information about her Marriage*

The trial court found that the mother married someone new in September 2018 but purposely hid that fact from DHHS. However, the trial court had ceased unification efforts and DHHS had stopped providing services to the mother as of 18 December 2017. There is no reason why the mother would have been aware that she had an obligation to inform DHHS nine months later of her marriage or to open her home to any social worker on demand. By this point, the trial court appears to be clutching at straws to find any possible grounds to fault the mother.

### 6. *Lack of Insight and Failure to Determine the Cause of David's Injuries*

This argument is simply the Court rehashing the first point above. At the end of the day, the trial court and this Court both can point to nothing more than that they are "troubled by [the mother's] continued failure to acknowledge the likely cause of David's injuries." However, David's mother has accepted responsibility for not keeping her son safe and, in open court, under oath, stated that she could not rule out the possibility that Mr. Goff injured her son. If she did not witness the abuse and does not know how it happened, she cannot honestly determine the cause.

The trial court's factual findings do not support the conclusion that the mother's parental rights are subject to termination. For the reasons discussed above,

the failure to explain David's injuries, under the specific facts of this case, is not sufficient to find that the mother failed to make reasonable progress in correcting the conditions that led to removal of her children, nor is it sufficient to find that she is likely to neglect them in the future.

With regard to termination of the mother's parental rights for neglect under N.C.G.S. § 7B-1111(a)(1), the trial court must evaluate the likelihood of future neglect. In doing so, the trial court was required to consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing. *In re Ballard*, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984). In the time between David's admission to the hospital in March 2015 and the termination hearing, the mother completed her case plan, developed a very positive record of visits with her children, and substantially complied with all of the court-ordered requirements. While she ultimately discontinued individual therapy, she attended sessions from March 2016 until April 2018, which was well after DHHS had ceased unification efforts in December 2017. In particular, the trial court found that there was a bond between Brianna and her mother at the time of the termination hearing. The court wrote that Brianna "loves her mother and enjoys spending time with her during visits." This finding, in conjunction with the court's other factual findings, does not support a likelihood of future neglect.

The trial court's findings of fact that (1) the mother had been charged with violating probation because she did not timely pay certain fees, (2) that she did not

inform DHHS of her marriage to B.H. in the absence of any evidence that she was required to do so, and (3) that she entered an *Alford* plea to misdemeanor child abuse are not sufficient to show either that she had failed to make reasonable progress or that she was likely to neglect her children in the future.

The evidence is clear from the record that, as of 18 December 2017 at the latest, the mother had completed the requirements of her case plan. In fact, DHHS was recommending at that time, not that the mother's parental rights be terminated, but that she be allowed unsupervised visitation because of her "compliance with her case plan, compliance with [DHHS], addressing the risk that led to the removal of the juveniles, and her accepting responsibility as the mother." Instead, the trial court determined that the mother had "not made adequate progress within a reasonable period of time under the [case] plan" because "[a]lthough she [had] addressed all of the conditions in her case plan," she had not explained how David was injured. The trial court then changed the primary permanent plan to adoption and ordered DHHS to pursue the termination of the mother's parental rights. The evidence in this case shows that the mother maintained from the outset that she did not harm her child, maintained from the outset that she did not know the cause of her child's injuries, and acknowledged her responsibility, as the primary caregiver, to protect her children. No evidence presented at any hearing suggested that the mother was lying about whether she injured David. At the time of the termination hearing, the only other person who could have harmed David, Mr. Goff, was no longer in the home.

-16-

Under those circumstances, the inability to identify the cause of a child's injuries should not, by itself, suffice to determine that the parent has not made "adequate progress" to correct the conditions leading to the juvenile's removal. It also should not suffice, under those circumstances, to establish a likelihood of future neglect.

While the foregoing analysis pertains equally to David and Brianna, I write further because the trial court again adjudicated Brianna neglected without making sufficient findings of fact. In the termination order, the trial court made only two relevant findings of fact pertaining to Brianna. First, the trial court noted that Brianna "was in the same home when the injuries to her brother occurred and her sole caretakers were" the mother and Mr. Goff. The trial court repeated the same fact later, noting Brianna's "presence in the home where the abuse of her sibling occurred." Second, the trial court noted that Brianna had been adjudicated neglected by an order entered 18 December 2017. No additional facts supported the December 2017 adjudication. However, the December 2017 order contains the following statement as to Brianna: "She faced a substantial risk of physical, mental or emotional impairment because she resided in the same injurious environment as [David], who DID suffer serious injuries, caused by other than accidental means."

The trial court's vague and generalized findings were insufficient to establish that Brianna was a neglected juvenile. It is true that when determining whether a juvenile is neglected, "it is relevant whether [the] juvenile . . . lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly

-17-

lives in the home." N.C.G.S. § 7B-101(15). However, finding only that another child in the home has suffered injury, as the trial court did in this case, is not sufficient. "A court may not adjudicate a juvenile neglected solely based upon previous Department of Social Services involvement relating to other children." *In re J.A.M.*, 372 N.C. 1, 9, 822 S.E.2d 693, 698 (2019). Instead, "clear and convincing evidence in the record must show current circumstances that present a risk to the juvenile." *Id.* "[O]ur courts have additionally required that there be some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide proper care, supervision, or discipline." *Id.* (emphasis omitted) (quoting *In re Stumbo*, 357 N.C. 279, 283, 582 S.E.2d 255, 258 (2003)). Here, the only basis upon which the court concluded that Brianna "faced a substantial risk of physical, mental or emotional impairment" was that Brianna lived in the home at the time of David's injuries. Piggybacking the termination of the mother's parental rights as to Brianna while merely citing the circumstances surrounding the injuries to David, without any evidence that Brianna is at a substantial risk of harm or neglect, is impermissible.

I am mindful of the fact that David and Brianna have been placed with a foster family and are, by all accounts, doing well. The evidence suggests that they have formed bonds with this new family and might very well happily stay there. By contrast, they have not lived with their mother for more than four years. Even so, these new family bonds came at the cost of those which already existed. The affidavit attached to the initial juvenile petition filed by DHHS notes that David was "very

bonded" to his mother. However, the trial court notes in its order terminating parental rights that "[t]here is no bond between [David] and [the mother]. Although [the mother] visits with [David] regularly . . . [David] does not look to [the mother] for comfort during the visits and is often playing alone. He appears relaxed in [the mother's] presence, but does not display affection." The trial court did not have sufficient factual and legal grounds to terminate the familial relationship between the mother and her children in this case. Accordingly, I would reverse the trial court's order terminating the mother's parental rights and remand for dismissal of the petition.